IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02483-LTB

JAMES M. AND LINDA J. GRUBKA, individually and on behalf of the
JAMES M. AND LINDA J. GRUBKA LIVING TRUST,

Plaintiffs,

v.

WEBACCESS INTERNATIONAL, INC.,
BLAIR WHITAKER,
J. ROGER MOODY,
L. SHAWN BRESKOW,
JAMES W. STUCKERT,
ARCHIBALD J. MCGILL,
WILEY E. PRENTICE, JR.,
STEVEN A. SPESARD,
STEVEN A. LYGA,
CAROL L. LEVEQUE,
DANIEL W. BOYD,
JAMES ROGERS, AND
J.J.B. HILLIARD, W.L. LYONS, INC.,

Defendants.

_____

**MOVING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED
COMPLAINT AND BRIEF IN SUPPORT**

_____

31103310.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................... 1

RULE 12(B)(6) STANDARDS UNDER THE PSLRA AND FED. R. CIV. P. 9(B)............ 3

DOCUMENTS CONSIDERED ON RULE 12(B)(6) MOTION ........................................ 4

ALLEGATIONS IN FIRST AMENDED COMPLAINT...................................................... 5

ARGUMENT AND AUTHORITIES ................................................................................... 6

    I.    The Claims Regarding The December 1, 2000 Investment Are Barred By The Applicable Statutes Of Limitations ................................... 6

        A.    Plaintiffs' Claims Regarding the 2000 Series A Offering Were Not Tolled By Stephens ................................................................. 6

        B.    The Securities Fraud And Failure-to-Register Claims (Claims 1, 2, and 3) Are Barred By The Applicable Statutes Of Repose......................................................................................... 8

        C.    Limitations For Plaintiffs' Other Claims Premised On The 2000 Series A Offering Are Barred By Inquiry Notice.................... 9

    II.    The Section 12(a)(1) Claim (Claim 1) And Section 12(a)(2) Claim (Part of Claim 2) For Both The 2000 And 2002 Offerings Are Barred By The One-Year Statute Of Limitations, As Judge Figa Held In Stephens............................................................................................... 15

        A.    The Rule 12(a)(1) Claim Is Time-Barred As To Both Offerings ...................................................................................... 15

        B.    The Section 12(a)(2) Claim Is Also Barred As To Both Offerings ...................................................................................... 17

    III.    The Rule 10b-5 Claim (Claim 2) And State Law Statutory (Claim 3), Common Law Fraud (Claim 4), And COCCA (Claim 5) Claims Do Not Adequately Allege Scienter ............................................................ 18

    IV.    For The 2000 Offering, Plaintiffs Do Not Plead Loss Causation, Which Is An Element Of A Rule 10b-5 (Claim 2), Common Law Fraud And Negligent Misrepresentation Claim (Claim 4), And COCCA Claim (Claim 5) ........................................................................ 19

    V.    The Controlling Person Claims Should Be Dismissed For The Same Reasons They Were Dismissed in Stephens ............................... 21

    VI.    Plaintiffs' Colorado Securities Act Claims (Count 3) Fail For The Same Reasons As The State Statutory Claims In Stephens ................. 22

    VII.    Plaintiffs Have Not Sufficiently Alleged A COCCA Claim For Either Offering...................................................................................... 23

    VIII.    Plaintiffs' Negligent Misrepresentation Claim Fails Under The "Third Party Transaction" Requirement ........................................................... 25

# TABLE OF CONTENTS

**Page**

IX.    Plaintiffs Lack Standing To Assert A Breach Of Fiduciary Duty
       Claim .................................................................................................. 26

X.     Plaintiffs' Series E Claims Against Carol Carnie And Archibald
       McGill And Their Series A Claims Against Blair Whitaker Fail
       Because These Individuals Were Not At WebAccess During The
       Time In Question .................................................................................. 27

CONCLUSION ............................................................................................... 28

**FEDERAL CASES**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ............... 4, 21, 22

*Barrett v. Rumsfeld*, 158 Fed. Appx. 89, 91 n.1 (10th Cir. 2005) .......................... 4

*Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396 (3d Cir. 2006) ...................... 4

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985) ..................................................................... 20, 21

*Brooks v. Bank of Boulder*, 891 F.Supp. 1469 (D. Colo. 1995) ......................... 19

*Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993) ................... 4, 11

*Caprin v. Simon Transp. Servs.*, 99 Fed. Appx. 150 (10th Cir. 2004) ....... 4, 10, 12

*Card v. Duker*, 122 Fed. Appx. 347 (9th Cir. 2005) ................................................ 7

*Chase v. Dow Chemical Co.*, 875 F.2d 278 (10th Cir. 1989) .............................. 19

*City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001) ................ 18

*Colorado National Bank of Denver v. Adventura Associate*,
   757 F.Supp. 1167 (D. Colo. 1991) ................................................................. 25

*D.E. & J L.P. v. Conaway*, 284 F.Supp.2d 719 (E.D. Mich. 2003) ...................... 18

*Devries v. Taylor*, No. 92-B-409,
   1993 U.S.Dist. LEXIS 21231 (D. Colo. June 28, 1993). ................................ 25

*Dobbs v. Cigna Security, Inc.*, 12 F.3d 346 (2d Cir. 1993) ................................ 11

*Dura Pharmaceutical, Inc. v. Broudo*, 125 S.Ct. 1627 (2005) ............................ 19

*In re Dynegy, Inc. Security Litigation*, 339 F.Supp.2d 804 (S.D. Tex. 2004) ....... 22

*FDIC v. Refco Group, Ltd.*, 184 F.R.D. 623 (D. Colo. 1999) .............................. 18

*Felts v. National Acc't System Association, Inc.*,
   469 F.Supp. 54 (N.D. Miss. 1978) ................................................................. 16

*Franze v. Equitable Assurance*, 296 F.3d 1250 (11th Cir. 2002) ........................ 11

*GFF Corp. v. Associate Wholesale Grocers*,
   130 F.3d 1381 (10th Cir. 1997) ....................................................................... 4

31103310.1

i

*Gale v. Great Southwestern Expl. Company, Inc.*,
    599 F.Supp. 55 (N.D. Okla. 1984) ................................................................. 16

*Gorman v. Coogan*, No. 03-173-P-H,
    2004 U.S.Dist. LEXIS 301 (D. Maine Jan. 13, 2004) ............................. 20, 21

*Hanson v. Johnson*, Civil No. 02-3709,
    2003 U.S.Dist. LEXIS 11717 (D. Minn. June 30, 2003)................................. 16

*Harner v. Prudential-Bache Security*, No. 92-1353, 1
    994 U.S.App. LEXIS 25266 (6th Cir. Sept. 9, 1994)................................. 11, 24

*In re Infonet Services Corp. Securities Litigation*,
    310 F.Supp.2d 1106 (C.D. Cal. 2003) ........................................................... 4

*In re Initial Public Offering Security Litigation*,
    214 F.R.D. 117 (S.D.N.Y. 2002)....................................................................... 7

*Insurance Consultants of America, Empl. Pension Plan v. Southeastern
    Insurance Group, Inc.*, 746 F.Supp. 390 (D.N.J. 1990) ................................. 11

*In re Integrated Resources Real Estate Ltd. P'ships Security Litigation*,
    850 F.Supp. 1105 (S.D.N.Y. 1993) ......................................................... 11, 24

*Johnson v. Railway Express Agency*, 421 U.S. 454 (1975).................................. 7

*Landy v. Mitchell Petroleum Technology Corp.*,
    734 F.Supp. 608 (S.D.N.Y. 1990) ........................................................... 11, 14

*Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1116 (N.D. Okla. 2003) .................... 23

*Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996) .............................. 4

*Malin v. IVAX Corp.*, 17 F.Supp.2d 131345 (S.D. Fla. 1998)............................ 4, 5

*Meadows v. Pacific Inland Securities Corp.*,
    36 F.Supp.2d 1240 (S.D. Cal. 1999) ........................................................... 16

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)................................................. 12

*In re Merrill Lynch Ltd. P'ships Litigation*, 7 F.Supp.2d 256 (2d Cir. 2005) .. 11, 24

*Morse v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 619 (S.D.N.Y. 1977)........ 16

*In re NAHC, Inc. Security Litigation*, 306 F.3d 1314 (3d Cir. 2002) ..................... 4

31103310.1

*Rahr v. Grant Thornton LLP*, 142 F.Supp.2d 793 (N.D. Tex. 2000)....................... 4

*Rediker v. Geon Industrial, Inc.*, 464 F.Supp. 73 (S.D.N.Y. 1978)................ 20, 21

*Resolution Trust Corp. v. Heiserman*, 839 F.Supp. 1457 (D. Colo. 1993) ......... 25

*In re Rockefeller Center Properties, Inc. Security Litigation*,
    311 F.3d 198 (3d Cir. 2002) ............................................................................ 4

*Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402 (S.D.N.Y. 1997)............... 4, 12

*Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) ....................................................... 4

*Sheldon v. Vermonty*, Fed.Sec.L.Rep. (CCH) P91,
    2000 U.S.App. LEXIS 27292 (10th Cir. Oct. 30, 2000). ................................ 15

*Shriners Hospitals for Children v. Qwest Communications International,
    Inc.*, No. 04-cv-0781-REB-CBS, 2005 U.S.Dist. LEXIS 40044
    (D. Colo. Sept. 23, 2005)............................................................................ 7, 18

*Smith v. Waste Mgmt., Inc.*, 407 F.3d 381 (5th Cir. 2005)................................... 26

*Snoey v. Advanced Forming Technology, Inc.*,
    844 F.Supp. 1394 (D. Colo. 1994) ............................................................... 25

*In re Stat-Technology International Corp.*, 47 F.3d 1054 (10th Cir. 1995)........... 26

*Stat-Technology Liquidating Trust v. Fenster*, 981 F.Supp. 1325
    (D. Colo. 1997)............................................................................................. 25

*Sterlin v. Biomune System*, 154 F.3d 1191 (10th Cir. 1998)................... 10, 11, 15

*Stichting Pensioenfonds, ABP v. Qwest Communications Int'l, Inc.*, No.
    04-RB-0238 (CBS), 2005 U.S.Dist. LEXIS 9026
    (D. Colo. March 30, 2005)............................................................................. 18

*Stutz v. Minn. Mining Manufacturing Co.*, 947 F.Supp. 399
    (S.D. Ind. 1996)............................................................................................... 7

*Temple v. Gorman*, 201 F. Supp. 2d 1238 (S.D. Fla. 2002) ............................... 23

*In re USEC Securities Litigation*, 190 F.Supp.2d 808 (D. Md. 2002) .............. 4, 11

*In re Ultrafem Inc. Security Litigation*, 91 F.Supp.2d 678  (S.D.N.Y. 2000) ........ 12

*United International Holdings, Inc. v. The Wharf (Holdings), Inc.*,
   946 F.Supp. 861 (D. Colo. 1996) .................................................................. 25

*In re Van Der Moolen Holding N.V. Security Litigation*, 405 F.Supp.2d
   388, 2005 U.S.Dist. LEXIS 32598 (S.D.N.Y. Dec. 13, 2005)........................ 18

*Wynne v. Equilease Corp.*, 94 Civ. 4992,
   1995 U.S.Dist. LEXIS 19173 (S.D.N.Y. Dec. 27, 1995) ............................... 24

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) ............................................................ 4

## STATE CASES

*Conrad v. Imatani*, 724 P.2d 89 (Colo. App. 1986).............................................. 19

*Lewis v. Spencer*, 577 A.2d 753 (Del. 1990) ....................................................... 26

*Nicholson v. Ash*, 800 P.2d 1352 (Col. App. 1990).............................................. 26

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) .......... 26

## FEDERAL STATUTES

15 U.S.C. § 77(a)................................................................................................. 15

15 U.S.C. § 77d .................................................................................................... 23

15 U.S.C. § 77m ................................................................................... 1, 8, 9, 15, 17

15 U.S.C. § 77r(b) ............................................................................................... 23

28 U.S.C. § 1658 ........................................................................................... 1, 8, 9

18 U.S.C. § 1962 .................................................................................................. 23

Fed. R. Civ. P. 9 ................................................................................................ 2, 3

Rule 12(B)(6 .......................................................................................................... 3

Defendants WebAccess International, Inc. ("WebAccess"), Blair Whitaker, J. Roger Moody, L. Shawn Breskow, James W. Stuckert, Steve A. Spesard, Steven A. Lyga, Archibald McGill, Carol L. Carnie, and Wiley E. Prentice Jr. ("Moving Defendants") move to dismiss all claims asserted in Plaintiffs' First Amended Complaint ("FAC").

<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This is a securities fraud case.  Plaintiffs, who do not deny that they are wealthy and sophisticated investors, allegedly invested $25,000 in WebAccess Series A preferred stock on December 1, 2000 and $13,411 in WebAccess Series E preferred stock on October 2, 2002.  FAC ¶¶ 31, 38.  Plaintiffs, however, did not file this action until December 8, 2005, meaning that their claims pertaining to the December 1, 2000 investment are time-barred.  The statute of repose for federal and state securities fraud claims is five years from the date of violation, with no discovery rule.  28 U.S.C. § 1658(b); C.R.S. § 11-51-604(8).  In addition, the statutes of repose for federal and state registration violations are three years and two years, respectively.  15 U.S.C. § 77m; C.R.S. § 11-51-604(8).  All securities-related claims pertaining to the December 1, 2000 purchase (Claims 1-3) are therefore time-barred.  In addition, the common law fraud, negligent misrepresentation, fiduciary duty, and Colorado Organized Crime Control Act ("COCCA") claims based on this offering (Claims 4-6) are likewise time-barred because, as discussed below, Plaintiffs were placed on inquiry notice of these claims when they received the offering documents in 2000 and again on November 28, 2002, when WebAccess went out of business.  Accordingly, all claims based on the 2000 Series A offering are barred by the applicable statutes of limitations.

31103310.1

1

Plaintiffs argue in vain that the relevant limitations periods for these claims were tolled from July 2003 through October 2005, during which time a putative class action filed by another group of WebAccess shareholders was pending before Judge Figa, who ultimately denied class certification.   That case was styled *Stephens et al. v. WebAccess et al.*, Case No. 1:03-cv-01521-PSF-PAC, and has since been resolved. Tolling, however, only applies to claims that were asserted in the class action.   The *Stephens* plaintiffs invested in a 1999 common stock offering and the 2002 Series E offering, but not the 2000 Series A offering, and they did not assert any claims based on the 2000 Series A offering.   Exh. C (*Stephens* Third Amended Complaint).   Indeed, Judge Figa refused to allow the proposed intervention of another plaintiff who invested in a 2000 convertible notes offering (which converted into Series A preferred stock) on the grounds that it "would change the scope of the claims or, if none of the named plaintiffs bought the 2000 convertible notes, there can be no claim regarding that offering."   Exh. B at 60:6-23.   Thus, assuming *arguendo* that tolling applies to Plaintiffs' 2002 Series E investment, tolling clearly does not apply to the Series A investment, which was not part of the class action.   The Series A claims must be dismissed.

In addition, at least two of the Defendants (Archibald McGill and Carol Carnie) were not even at the company when the 2002 Series E offering occurred, while one of the Defendants (Blair Whitaker) did not become affiliated with WebAccess until August 2001, long after the Series A offering occurred.   Naturally, a individual defendant cannot be liable for actions that allegedly occurred when they were not even at the company.

Finally, Plaintiffs' claims regarding both offerings fail because Plaintiffs have not satisfied the pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities

Litigation Reform Act ("PSLRA"), and for several additional reasons discussed below. Plaintiffs' inability to satisfy the PSLRA is especially telling given that Plaintiffs' counsel already conducted substantial discovery during the *Stephens* litigation. Plaintiffs' counsel reviewed thousands of documents and conducted more than 20 depositions, yet still cannot plead a claim. This case should be dismissed.

### GROUNDS FOR DISMISSAL

The claims fail as a matter of law because they do not allege the following elements and/or are subject to the following defenses:

- All claims pertaining to the 2000 Series A offering are barred by the applicable statutes of limitations.

- For Claims 2 (Rule 10b-5), 3 (state law securities fraud), 4 (common law fraud), and 5 (COCCA), Plaintiffs have not adequately pled scienter for either offering.

- To the extent Claims 2 (Rule 10b-5), 3 (state law securities fraud), 4 (common law fraud and negligent misrepresentation), and 5 (COCCA) are predicated on the 2000 Series A offering, Plaintiffs have not adequately pled loss causation.

- For the control-person claims under Claims 2 and 3, Plaintiffs have not adequately pleaded control.

- The statutory state securities claims in Claim 3 are preempted by the National Securities Market Improvement Act ("NSMIA").

- The negligent misrepresentation claim fails because Plaintiffs do not allege damages suffered in transactions with third parties.

- Plaintiffs lack standing to assert a fiduciary duty claim.

### RULE 12(B)(6) STANDARDS UNDER THE PSLRA AND FED. R. CIV. P. 9(B)

Under the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), securities fraud claims must be pled with particularity. Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the

31103310.1

3

required state of mind (scienter)" and, for allegations made on "information and belief,"
must "state with particularity all facts on which that belief is formed.   15 U.S.C. 78u-
4(b)(1) and (2); 340 F.3d at 1087-88.   In addition, courts routinely dismiss securities
fraud complaints when inquiry notice can be determined from the complaint and SEC
filings.[1]   Only well pleaded factual allegations are taken as true on a motion to dismiss,
while conclusory allegations are disregarded.   *See Adams v. Kinder-Morgan, Inc.*, 340
F.3d 1083, 1088 (10th Cir. 2003).

## DOCUMENTS CONSIDERED ON RULE 12(B)(6) MOTION

In addition to the complaint itself, the Court may also consider any documents
that are "incorporated into [the complaint] by reference."[2]   Defendants thus may rely on

---

[1] *See, e.g. Caprin v. Simon Transp. Servs.*, 99 Fed. Appx. 150, 156-57 (10th Cir. 2004) (affirming Rule 12(b)(6) dismissal of Securities Act claim under inquiry notice doctrine); *see also Shah v. Meeker*, 435 F.3d 244, 248 (2d Cir. 2006) ("'Where inquiry notice is clearly established, dismissal of a securities-fraud complaint as untimely may be readily affirmed'") (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 403-04 (3d Cir. 2006) (affirming dismissal of complaint on inquiry notice grounds); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162-63 (4th Cir. 1993) ("Where the underlying facts are undisputed, the issue of whether the plaintiff has been put on inquiry notice can be decided as a matter of law"; affirming dismissal); *In re Fleming Cos. Sec. & Deriv. Litig.*, No. 5-03-MD-1530 (TJW), MDL-1530, 2004 U.S. Dist. LEXIS 26488, at *146 (E.D. Tex. June 10, 2004) ("It is well-settled [that] inquiry notice may be determined as a matter of law" on a motion to dismiss when "'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint'") (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)); *In re Infonet Servs. Corp. Secs. Litig.*, 310 F. Supp. 2d 1106, 1120-21 (C.D. Cal. 2003) (granting motion to dismiss based on inquiry notice); *In re USEC Secs. Litig.*, 190 F. Supp. 2d 808, 821 (D. Md. 2002) ("Where, as here, the pleadings and public documents demonstrate that plaintiffs were on inquiry notice more than a year before the complaint was filed, a court may appropriately grant a motion to dismiss"); *Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793, 796-97 (N.D. Tex. 2000) (inquiry notice doctrine "not only allows but '*mandates* dismissal of . . . a plaintiff's securities fraud claim when the 'pleadings disclose facts sufficient to have placed the plaintiff on inquiry notice of the alleged fraud prior to the one-year cutoff'") (emphasis in original) (quoting *Barnes v. Printron, Inc.*, No. 93-CIV-5085 (JFK), 1998 WL 778378, at *6 (S.D.N.Y. Nov. 5, 1998)); *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1412 (S.D.N.Y. 1997) (granting motion to dismiss because SEC filings and press releases put plaintiff on inquiry notice more than one year before complaint was filed).

[2] *Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (collecting cases); *Barrett v. Rumsfeld*, 158 Fed. Appx. 89, 91 n.1 (10th Cir. 2005) (same); *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 205-06 (3d Cir. 2002) (same); *GFF Corp. v. Assoc. Wholesale Grocers*, 130 F.3d 1381, 1384-85 (10th Cir. 1997) (same).

the offering documents referenced in the Complaint, which form the basis for Plaintiff's claims.  It is also well-settled that a court may consider public SEC filings on a motion to dismiss for purpose of determining whether an investor is on inquiry notice.[3] Accordingly, the Court may consider Applied Computer Technology's August 1999 proxy (Exh. E), which was duly filed with the SEC and is available on the SEC's website.

<u>ALLEGATIONS IN FIRST AMENDED COMPLAINT</u>

WebAccess was formed in April 1999.  The president of WebAccess, Defendant Wiley E. Prentice Jr. ("Prentice"), previously was president of a publicly traded company called Applied Computer Technology, Inc. ("ACT"), which was in the business of selling computers.  Exh. D at 60.  During the late 1990s, ACT had a subsidiary called ActNet, which operated as an internet service provider ("ISP").  *Id.*

In November 1998, ACT discontinued operations and declared itself to be insolvent.  Exh D at 60.  ACT publicly disclosed in an SEC filing that it owed $4 and $5 million to creditors at the time of its insolvency, including unpaid tax obligations.  *Id.*; Exh. E at 5 and 6.  In August 1999, ACT publicly filed a Schedule 14A proxy form with the Securities Exchange Commission in which ACT disclosed its plan to form a new company called WebAccess, which would raise capital from investors to acquire the assets of ActNet from ACT.  *See* Exh. E.  ACT disclosed that it was forming a new company because, not surprisingly, investors were "reluctant to invest in either [ACT] or

---

[3] *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may consider SEC filings on motion to dismiss; collecting cases); *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996) (same); *Malin v. IVAX Corp.*, 17 F. Supp. 2d 131345, 1352 (S.D. Fla. 1998) (same).

ActNet due to the substantial amounts owed by [ACT] to its creditors." Exh. E. at 5. WebAccess conducted a private placement of common stock in June 1999.

In 2000, WebAccess engaged J.J. B. Hilliard, W.L. Lyons, Inc. ("Hilliard Lyons") to complete a private placement of Series A preferred stock. Plaintiffs Dr. James Grubka, Linda Grubka, and the Grubka Family Trust ("Plaintiffs") allegedly invested $25,000 in this offering on December 1, 2000, in supposed reliance on an October 26, 2000 Private Placement Memorandum (the "October 2000 Memorandum"), which is attached as Exhibit D.  FAC ¶¶ 27-3.  On October 2, 2002, Plaintiffs allegedly invested $13,411 in a Series E preferred offering, supposedly in reliance on: (1) WebAccess's 2001 Annual Report and 2002 quarterly reports; (2) oral representations by Mr. David Melges, who apparently was Plaintiffs' local Hilliard Lyons broker in Michigan and is not a defendant in this action; and (3) an August 5, 2002 letter from WebAccess CEO Wiley E. Prentice Jr. (the "August 2002 letter").  FAC ¶¶ 33-38.  On November 27 or 28, 2002, WebAccess ceased doing business.  *Id.* ¶ 62.

Early stage investing in a startup company before there is a public market for the company's stock is obviously a high risk proposition.  The offering documents were replete with cautionary statements, including a 12-page list of specific risk factors and explicit warnings that, among other things, WebAccess was "not aware of any company that has achieved positive EBITDA, operating income or cash flow by executing a business plan like ours," and that the proceeds from the Series A offering would only fund the company "through approximately the second quarter of 2001."  Exh. D at 20.

<u>ARGUMENT AND AUTHORITIES</u>

**I.    The Claims Regarding The December 1, 2000 Investment Are Barred By The Applicable Statutes Of Limitations**

Plaintiffs' claims regarding the December 1, 2000 Series A investment were not tolled by the *Stephens* class action and are thus barred by limitations.

**A.    Plaintiffs' Claims Regarding the 2000 Series A Offering Were Not Tolled By *Stephens***

"[T]he filing of a putative class action complaint tolls the period of limitations only for claims that are identical to the claims asserted in the putative class action complaint."[4]   The *Stephens* plaintiffs did not buy any Series A preferred stock and asserted no claims based on this offering.   Exh. C (*Stephens* Third Amended Complaint).   During that case, another shareholder named Dane Kirkpatrick, who had purchased shares in a March 2000 convertible notes offering (which converted into Series A stock), attempted to intervene.   In denying Kirkpatrick's motion to intervene, Judge Figa found that the class action did not include any claims based on the 2000 convertible notes offering, given that this was a separate offering in which the *Stephens* plaintiffs had not invested, and that allowing Kirkpatrick to intervene would improperly expand the scope of the class action.   Exh. B at 60:6-23 ("It would appear that the addition of Kirkpatrick now would change the scope of the claims or, if none of the named plaintiffs bought the 2000 convertible notes, there can be no claim regarding that

---

[4] *Shriners Hospitals for Children v. Qwest Communications Int'l, Inc.*, No. 04-cv-0781-REB-CBS, 2005 U.S. Dist. LEXIS 40044, at *15 (D. Colo. Sept. 23, 2005); *Johnson v. Railway Express Agency*, 421 U.S. 454, 467 n.14 (1975); *see also Card v. Duker*, 122 Fed. Appx. 347, 349 (9th Cir. 2005) ("The Supreme Court has thus not extended tolling due to class litigation beyond *American Pipe*'s narrow allowance for identical causes of action brought where the class was decertified"); *Stutz v. Minn. Mining Mfg. Co.*, 947 F. Supp. 399, 403 (S.D. Ind. 1996) (plaintiff must have "individual claims identical to those claims in a viable class action" for tolling to apply).

offering"); *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("In order to maintain a class action, plaintiffs must first establish that they have a valid claim with respect to the shares that they purchased.  If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed . . . .").

Accordingly, the claims based on the Series A preferred stock offering were not tolled by the *Stephens* class action.  As with the March 2000 convertible notes offering in which Kirkpatrick invested, the 2000 Series A preferred stock offering in which Plaintiffs invested was not part of the class action.  This offering occurred at a different time and involved different securities with different features, different terms, different prices, different offering materials, different cautionary statements, and different representations as the 1999 common stock and 2002 Series E offerings that were involved in *Stephens*.  The claims relating to the Series A 2000 offering (which represent $25,000 of Plaintiffs' $38,411 investment) therefore were not tolled.

**B.    The Securities Fraud And Failure-to-Register Claims (Claims 1, 2, and 3) Are Barred By The Applicable Statutes Of Repose**

Plaintiffs assert claims for federal registration violations (Claim 1), federal securities fraud (Claim 2), and state law registration and securities fraud violations under the Colorado Securities Act (Claim 3).  To the extent these claims are premised on the 2000 Series A offering (which was not part of the *Stephens* class action), they are barred by the applicable statutes of repose.  Federal registration violations under Section 12(a)(1) of the Securities Act (Claim 1) must be brought within "three years after the sale."  15 U.S.C. § 77m.  Federal claims for false statements in a registration statement or prospectus under Section 12(a)(2) of the Securities Act (the first cause of

action asserted in Claim 2) must be brought within "one year after the violation upon which it is based." *Id.* Federal securities fraud claims under Rule 10b-5 (Claim 2) must be brought "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) ***5 years after such violation***." 28 U.S.C. § 1658(b) (emphasis added).  Claims for registration violations under C.R.S. § 11-51-301 (the first claim asserted under "Claim 3") must be brought within "two years after the contract of sale," while claims for securities fraud under C.R.S. § 11-51-501 must be brought within "five years after the purchase or sale."  C.R.S. § 11-51-604(8).  These time limits are "absolute" and do not depend on when Plaintiffs discovered the alleged violations.

Plaintiffs did not file this action until December 8, 2005, which is more than five years after they purchased their Series A stock on December 1, 2000.  To the extent Claims 1, 2, and 3 are premised on the Series A offering, they are time-barred.

      **C.**      **Limitations For Plaintiffs' Other Claims Premised On The 2000 Series A Offering Are Barred By Inquiry Notice**

          **1.**      **Plaintiffs Need Only Be Aware Of The "Possibility" Of Fraud For The Clock To Begin Running**

Plaintiffs' claims for federal and state securities fraud (Claims 2 and 3), along with Plaintiffs' state law claims for common law fraud and negligent misrepresentation (Claim 4), COCCA (Claim 5), and breach of fiduciary duty (Claim 6) are also barred because Plaintiffs had notice of potential claims more than two or three years ago.  Federal claims under Section 12(a)(2) (the first claim asserted under Claim 2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  Federal securities fraud claims under Rule 10b-5 (Claim 2) must be

brought within "2 years after the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b).  Plaintiffs' state law claims are subject to limitations periods of two or three years, with near-identical language regarding the "date of discovery" as in 28 U.S.C. § 1658(b).[5]

The clock begins to run after the plaintiff is on inquiry notice.  "[I]nquiry notice . . . triggers an investor's duty to exercise reasonable diligence," and limitations "begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."  *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998).  "Inquiry notice" is "the point when a reasonable investor is put on notice of the *possibility* of fraud."  *Id.* at 1199 (emphasis added).  Plaintiff "need not . . . have fully discovered the nature and extent of the fraud before [he was] on notice that something may have been amiss.  ***Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.***"  *Sterlin*, 154 F.3d at 1203 (emphasis added); *see also Caprin v. Simon Transp. Servs.*, 99 Fed. Appx. 150, 155 (10th Cir. 2004) ("Evidence of the possibility of fraud, rather than the particular details of the fraud, is all that is required to begin the limitations period").  The Tenth Circuit has held that "[i]n the proper circumstances, even rumors or vague charges would suffice to put a reasonable investor on notice of possible fraud."  *Caprin*, 99 Fed. Appx. at 156.

---

[5] State law claims under C.R.S. § 11-51-301 (part of Claim 3) must be asserted within "two years after the contract of sale," while claims under C.R.S. § 11-51-501 (the other claim asserted in Claim 3) must be brought within "three years after the discovery of the facts giving rise to a cause of action . . . or after such discovery should have been made by the exercise of reasonable diligence and in no event more than five years after the purchase or sale . . . ."  C.R.S. § 11-51-604(8).  Common law fraud and negligent misrepresentation claims (Claim 4) must be asserted within three years from "the date such fraud, misrepresentation, concealment, or deceit is discovered or should have been discovered by the exercise of reasonable diligence."  C.R.S. § 13-80-101(1)(c); 13-80-108(3).  COCCA claims must be asserted within two years of the date of discovery.  C.R.S. § 13-80-102(1)(a).  The statute of limitations for Plaintiffs' derivative claim for breach of fiduciary duty is three years.  C.R.S. § 13-80-101(1)(f).

Plaintiffs thus can be on inquiry notice of a Rule 10b-5 claim if they have reason to believe that *some* misrepresentations in an offering document were false, even if they are not aware of the full extent of the alleged fraud, or that other representations in the document are also false.   In *Sterlin*, the Tenth Circuit held that a magazine article generally critical of a company's claims regarding its products placed an investor on inquiry notice of the possibility of fraudulent activity.   *Sterlin*, 154 F.3d at 1204.

Once a plaintiff is on inquiry notice, the limitations period will begin to run on the date when the plaintiff reasonably should have discovered the facts underlying the alleged fraud.   *Sterlin*, 154 F.3d at 1201.   The purpose of the inquiry notice rule is "to protect the innocent investor, ***not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.***"   *Id.* (emphasis added).

A plaintiff can be placed on inquiry notice if facts that he claims were misrepresented can be discerned simply from reading the offering documents themselves.[6]   This is particularly true when, as here, the plaintiff is a sophisticated

---

[6]   *See Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (holding that class representatives "could have discovered the alleged misrepresentations simply by reading" the prospectus and were thus on inquiry notice when they received the offering documents); *Harner v. Prudential-Bache Sec.*, No. 92-1353, 1994 U.S. App. LEXIS 25266, at *15-17 (6th Cir. Sept. 9, 1994) (agreeing that discrepancies in prospectus disclosures triggered inquiry notice despite plaintiffs' argument that "the Prospectus does not directly refute all of the" prior disclosures); *Dobbs v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993) (determining that plaintiff was "on inquiry notice when she made the investments in question" because of disclosures of the risks involved in the prospectuses, which made her complaint untimely); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163 (4th Cir. 1993) ("when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims"); *In re USEC Secs. Litig.*, 190 F. Supp. 2d 808, 819-20 (D. Md. 2002) (disclosures in prospectus triggered inquiry notice); *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 266-67 (S.D.N.Y. 1997) (finding inquiry notice from disclosures in offering documents and annual reports); *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 617 (S.D.N.Y. 1990) (agreeing that "even if every aspect of the fraud now claimed by plaintiffs was not revealed in the offering materials, the explicit and repeated warnings in those materials of potential risk and past performance put plaintiffs on 'inquiry notice' that all was not right with the partnerships"); *Insurance Consultants of Am., Empl. Pension Plan v. Southeastern Ins. Group, Inc.*

investor in a private placement.[7]   Public SEC filings can also place a reasonable investor on inquiry notice, and such documents may be considered on a motion to dismiss.[8]  It is well settled that "SEC filings are generally sufficient to place investors on constructive notice of their contents."  *See Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 700 (5th Cir. 2004); *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995) (same); *Healthtrac, Inc. v. Sinclair*, 302 F. Supp. 2d 1125, 1128-29 (N.D. Cal. 2004) (filing of Section 16(a) reports with SEC put shareholders on notice of claims); *Snyder v. Newhard, Cook & Co.*, 764 F. Supp. 612, 618 (D. Colo. 1991) (noting that SEC registration filings are "a matter of public record" and are "easily uncovered").

> **2.     Plaintiff Received Specific Notice Of Many Of The Precise Facts That Were Allegedly Misrepresented Or Concealed**

While the Tenth Circuit has held that "even rumors or vague charges" can trigger inquiry notice, *Caprin*, 99 Fed. Appx. at 156, the case for inquiry notice here is far stronger.  Indeed, Plaintiffs had ***actual notice*** on or before December 1, 2000 of many of the facts they now claim were misrepresented or concealed.

---

746 F. Supp. 390, 407-08 (D.N.J. 1990) (limitations period for sophisticated private plaintiffs ran from date of offering materials containing risk disclosures; collecting cases).

[7] *See Landy*, 734 F. Supp. at 617 ("But the law is not so forgiving, particularly where, as here, plaintiffs certified by their purchase that they were sophisticated investors who had knowledge of the offering materials"); *Insurance Consultants*, 746 F. Supp. at 407-08 (same); *In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1123 (S.D.N.Y. 1993) (investors in private placement on notice of RICO claim simply by reading offering document).  Plaintiffs do not deny that they are sophisticated investors.

[8] *Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993) (affirming dismissal where plaintiffs were placed on inquiry notice by SEC filings); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692-93 (S.D.N.Y. 2000) (existence of one article and one public filing triggered inquiry notice); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997) (finding inquiry notice based on SEC filings).

Many of the facts that Plaintiffs claim were misrepresented were, in fact, expressly disclosed in the offering documents and proxy:

- Plaintiffs claim that the Series A PPM failed to disclose that "defendants Prentice, Spesard, and Moody had managed Applied Computer Technology, Inc., and ActNet, Inc., into insolvency." FAC ¶ 29(n). In fact, the Series A PPM explicitly disclosed that ACT became insolvent in 1998, and that Defendants Prentice (as President and CEO), Spesard, and Moody had previously been involved with ACT. Exh. D at 54, 55, 60.

- Earlier in 2000, WebAccess raised additional capital by selling convertible debt instruments that would convert to Series A stock if the Series A offering was successful. Plaintiffs assert that Defendants failed to disclose that "the funds received by defendants in the 2000 convertible note offerings were required to be returned to the convertible note investors in the event that at least $5 million was not invested in the Series A offering," and that "WebAccess and the Hilliard Lyons defendants would be responsible to repay the convertible note investors in the event that the Series A offering did not close." FAC ¶ 29(a) and (b). In fact, however, the 2000 Series A Memorandum disclosed the numerous convertible note obligations, made clear that they would only convert to stock "[u]pon the closing of this offering," and also explicitly disclosed that WebAccess could be forced to rescind these notes and return up to $1,127,500 of these proceeds, plus fines and penalties, due to possible registration irregularities with the notes. Exh. D at 23-24,33-34.

- Plaintiffs allege that the Series A PPM misrepresented that WebAccess would "provide holders of preferred stock with quarterly unaudited financial statements." FAC ¶ 29(j). Obviously, if Plaintiffs were not receiving quarterly financial statements, they would have noticed that in the first or second quarter of 2001.

- Plaintiffs assert that the Series A PPM "fail[ed] to disclose that defendants intended to use a portion of the proceeds to repay loans purportedly made by certain defendants to WebAccess." FAC ¶ 29(j). In fact, the Series A PPM explicitly disclosed that WebAccess had loans outstanding to Defendants Moody and McGill. Exh. D at 61.

- Plaintiffs allege that the offering proceeds were depleted within two months. FAC ¶ 29(l). In fact, the Series A PPM made clear that the offering proceeds would only fund the company "through approximately the second quarter of 2001," and that WebAccess could need additional financing "sooner than anticipated." Exh. D at 20, 35. Plaintiffs therefore knew that WebAccess would run out of money shortly after the offering.

In addition, many of Plaintiffs' allegations are based on WebAccess's use of the offering proceeds from the 1999 common stock offering to acquire ActNet from ACT. Plaintiffs assert that the 2000 Series A PPM "failed to disclose that the purchase price of ActNet had been substantially greater than its actual value" and "failed to disclose that WebAccess had assumed in the purchase of ActNet hundreds of thousands of dollars of ActNet's liability including liability to the Internal Revenue Service for which WebAccess's officers and directors could otherwise have been personally liable."  FAC ¶¶ 29(q) and (r).  In August 1999, however, ACT disclosed in a public filing with the SEC that WebAccess would pay a substantial premium over market value for ActNet, and that the ActNet payment would be used to compensate creditors (to which ACT owed more than $4 million) and pay back taxes to the IRS.  The proxy stated that while ACT could only obtain "400,000 from the sale of ActNet on the open market," the WebAccess offering would allow it to receive $600,000 for ActNet, plus 200,000 shares of common stock.  Exh. E at 5.  Indeed, a major purpose of the WebAccess offering was to enable ACT to receive more for ActNet than it could obtain in an open-market, arms-length transaction.  The proxy also disclosed that the ActNet purchase price would include "the assumption of liabilities" by WebAccess, and that the ActNet purchase price "will be used to satisfy certain priority claims of the Company, ***including claims of the Internal Revenue Service and creditors who have a lien on the assets on ActNet***."  *Id.* at 6 (emphasis added).  Plaintiffs therefore had inquiry notice that one major purpose of the 1999 WebAccess offering and ActNet acquisition was to generate additional capital to pay past ACT and ActNet obligations (including back taxes), in part by causing WebAccess to assume some of these obligations.

Finally, Plaintiffs clearly were on notice of their claims as of November 28, 2002, the date when WebAccess went out of business.  *See* FAC ¶¶ 54, 62.  Indeed, Plaintiffs themselves contend that the unexpected closure of WebAccess was indicative of fraud, given WebAccess's prior representations that it "had raised $3 million in new capital and had additionally received $2.2 million more in other commitments" shortly before the company went out of business.  *Id.* ¶ 54.  Given that the company folded more than three years before Grubka filed suit, all of the claims based on the Series A 2000 Offering can be dismissed on this ground alone.  Regardless, Plaintiffs had notice of many of the alleged misrepresentations by late 2000 or early 2001, which is sufficient to trigger the statute of limitations for all of Plaintiffs' claims.

As stated above, Plaintiffs need not have notice of every alleged misrepresentation before the clock starts to run.  *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 617 (S.D.N.Y. 1990) (agreeing that "even if every aspect of the fraud now claimed by plaintiffs was not revealed in the offering materials, the explicit and repeated warnings in those materials of potential risk and past performance put plaintiffs on 'inquiry notice' that all was not right with the partnerships").  "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself."  *Sterlin*, 154 F.3d at 1203.  As such, all the 2000 Series A claims must be dismissed.

**II.    The Section 12(a)(1) Claim (Claim 1) And Section 12(a)(2) Claim (Part of Claim 2) For Both The 2000 And 2002 Offerings Are Barred By The One-Year Statute Of Limitations, As Judge Figa Held In *Stephens***

**A.    The Rule 12(a)(1) Claim Is Time-Barred As To Both Offerings**

In addition, Plaintiffs' federal claims for registration violations are time-barred for *both* the Series A and Series E offerings, regardless of whether the Series A claims

were tolled.  In Count I, Plaintiffs assert a claim under Section 12(a)(1) of the Securities Act of 1933 (15 U.S.C. § 77(a)(1)) for selling unregistered securities in both the 2000 Series A and 2002 Series E offerings.  *See* FAC ¶¶ 65-72.  Judge Figa dismissed an identical claim brought by the *Stephens* plaintiffs, holding that it was barred by the one-year statute of limitations for Section 12(a)(1) claims.  Exh. A at 15:5-7 ("Here, the Complaint, on its face, indicates that the operative events fall outside the applicable statutes of limitations").  To assert a claim under Section 12(a)(1), "[t]he purchaser must bring the action 'within one year after the violation upon which it is based' and, in no event, 'more than three years after the security was bona fide offered to the public.'"[9] The phrase "bona fide offered to the public" refers to the date "when the unregistered security is first offered for sale."[10]  Section 13's limitations requirements are "absolute" and cannot be tolled.[11]  Because the FAC admits that the alleged registration violations during the two offerings occurred before December 1, 2000 and October 2, 2002, respectively (more than one year before the First Amended Complaint in *Stephens* was filed, which was the first pleading in that case to assert the Series E claims), the claim is barred under the one year statute of limitations.  FAC ¶¶ 31, 38.

With respect to the Series E offering, Judge Figa held in *Stephens* that those claims did not become part of the class action until the filing of the First Amended

---

[9] 15 U.S.C. § 77m; *Sheldon v. Vermonty*, Fed. Sec. L. Rep. (CCH) P91, 253, 2000 U.S. App. LEXIS 27292, *13 (10th Cir. Oct. 30, 2000).

[10] *Hanson v. Johnson*, Civil No. 02-3709, 2003 U.S. Dist. LEXIS 11717, *17 (D. Minn. June 30, 2003); *Morse v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 619, 621 & n.3 (S.D.N.Y. 1977).

[11] *See, e.g., Meadows v. Pacific Inland Secs. Corp.*, 36 F. Supp. 2d 1240, 1250-51 (S.D. Cal. 1999) ("A reasonable construction of (Section 12(a)(1) is that Congress intended the one year limitations period of Section 12(1) claims to be absolute."); *Carl v. Galuska*, No. 90 C 3837, 1991 U.S. Dist. LEXIS 1069, *9 (N.D. Ill. Feb. 1, 1991) ("Section 12(1)'s one-year statute of limitations is absolute – not subject to

Complaint on October 6, 2003, since they were not asserted in the original complaint filed in July 2003.  Exh. A at 13:17-25.  Judge Figa further held that the Series E claims (as well as the 1999 claims) were untimely because they were not asserted until more than one year after the 2002 Series E offering.  Judge Figa dismissed those claims as time-barred and issued his order on March 14, 2005, meaning that any tolling effect by the assertion of these claims in the class action ended that day.  *Id.*  Accordingly, the Section 12(a)(1) claims based on the Series E offering were already time-barred before they were asserted in *Stephens*, and in any event, the passage of an additional nine months between Judge Figa's dismissal of these claims last March and the filing of the Grubkas' complaint in December renders this claim even more untimely.

### B.    The Section 12(a)(2) Claim Is Also Barred As To Both Offerings

As part of their Second Claim for Relief (along with the Section 10(b) and Rule 10b-5 claims discussed above), Plaintiffs assert that Defendants violated Section 12(a)(2) of the Securities Act in both offerings by making false statements in a prospectus (even though this was a private offering and there was no prospectus). Judge Figa held that the Section 12(a)(2) claim (like the 12(a)(1) claim) was barred by the one year statute of limitations under Section 13 of the Securities Act for both the 1999 common stock offering ***and the 2002 Series E offering***.  Exh. A at 17:8-9 ("Therefore, the Section 12(a)(2) claim must fail, too, for falling outside the applicable

---

equitable tolling."); *Gale v. Great Southwestern Expl. Company, Inc.*, 599 F. Supp. 55, 58-59 (N.D. Okla. 1984); *Felts v. Nat'l Acc't Sys. Ass'n, Inc.*, 469 F. Supp. 54, 64 (N.D. Miss. 1978).

statutes of limitations periods"); 15 U.S.C. § 77m.  Plaintiffs' Section 12(a)(2) claim is identical to the Section 12(a)(2) claim dismissed in *Stephens* and likewise fails.[12]

Plaintiffs' Section 12(a)(2) claims for both offerings fail for the additional reason that Plaintiffs clearly had inquiry notice of these claims as of November 28, 2002, when WebAccess went out of business.  More than ten months passed between November 28, 2002 and the *Stephens'* plaintiffs' assertion of these claims on October 6, 2003.  Almost another nine months elapsed after Judge Figa dismissed these claims from the class action on March 14, 2005, before Plaintiffs filed their claims.  Accordingly, more than one year of indisputably "untolled" time has passed, thus rendering Plaintiffs' Section 12(a)(2) claim untimely as to both offerings.

## III.    The Rule 10b-5 Claim (Claim 2) And State Law Statutory (Claim 3), Common Law Fraud (Claim 4), And COCCA (Claim 5) Claims Do Not Adequately Allege Scienter

Plaintiffs' fraud-based claims for both offerings also fail because Plaintiffs have not adequately alleged the scienter of each Defendant.  Plaintiffs' claims for federal securities fraud (Claim 2), Colorado statutory and common law fraud (included under Claims 3 and 4), and COCCA (Claim 5) require intentional or severely reckless conduct as an element.[13]   Under the PSLRA, Plaintiffs must plead specific facts supporting a

---

[12] The *Stephens* plaintiffs also asserted a claim under Section 11 of the Securities Act, which applies to false statements in a registration statement.  Judge Figa dismissed that claim on the ground that no registration existed (given that there was no IPO).  Exh. A at 17:10-25.  Plaintiffs do not appear to assert a Section 11 claim in the current action.

[13] *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001) (plaintiff must allege "intent to deceive, manipulate, or defraud" and "knowing or intentional misconduct" to allege Rule 10b-5 claim); *Shriners Hospitals,* 2005 U.S. Dist. LEXIS 40044, at *39-40 and *45 (claims under C.R.S. § 11-51-501 and for common law fraud require scienter; claims failed because individual defendants not aware statements were materially misleading); *FDIC v. Refco Group, Ltd.*, 184 F.R.D. 623, 629 (D. Colo. 1999) (COCCA claims require "proof of intentional conduct").

strong inference of scienter as to each individual Defendant. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001); *Shriners Hospitals*, 2005 U.S. Dist. LEXIS 40044, at *25. While the "group pleading" doctrine allows plaintiffs to attribute alleged misstatements in a group published document to a company's officers and directors under certain circumstances, ***the group pleading doctrine does not excuse Plaintiffs from the obligation to plead specific facts supporting a strong inference that each individual Defendant acted knowingly or with severe recklessness***.[14]

While Plaintiffs include a laundry list of alleged false statements and/or omissions made in connection with these offerings, Plaintiffs do not plead specific facts supporting a strong inference (or any inference) that each of the individual Defendants knew that the 2000 Series A PPM or any of the documents that Plaintiffs supposedly relied on in connection with the 2002 Series E offering contained material misstatements or omissions (or were severely reckless in not knowing). Plaintiffs simply lump all Defendants together without alleging any facts demonstrating how each individual Defendant knew the statements were false or misleading.

Accordingly, Plaintiffs have failed to plead scienter and therefore cannot plead a claim for securities fraud (state or federal), common law fraud, or COCCA (which involves an even higher standard of "knowing" conduct) based on either offering.

---

[14] *See Stichting Pensioenfonds, ABP v. Qwest Communications Int'l, Inc.*, No. 04-RB-0238 (CBS), 2005 U.S. Dist. LEXIS 9026, at *36-38 (D. Colo. March 30, 2005) (differentiating between scienter of inside and outside directors); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 2005 U.S. Dist. LEXIS 32598, at *54 (S.D.N.Y. Dec. 13, 2005) ("even where statements are imputed to all defendants pursuant to the group pleading doctrine, plaintiffs must still establish scienter as to each defendant") (collecting cases; internal quotations omitted); *D.E. & J L.P. v. Conaway*, 284 F. Supp. 2d 719, 742 (E.D. Mich. 2003) ("those courts that have continued to apply the group pleading doctrine have held that scienter must be pleaded separately as to *each* defendant"), *aff'd*, 2005 U.S. App. LEXIS 11267 (6th Cir. 2005) (emphasis in original; collecting cases).

**IV.    For The 2000 Offering, Plaintiffs Do Not Plead Loss Causation, Which Is An Element Of A Rule 10b-5 (Claim 2), Common Law Fraud And Negligent Misrepresentation Claim (Claim 4), And COCCA Claim (Claim 5)**

Plaintiffs' claims based on the 2000 Series A Offering also fail because Plaintiffs have not pled loss causation.  To plead a Rule 10b-5 claim, Plaintiffs must plead "that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1629 (2005).  Causation is also a required element of common law fraud and negligent misrepresentation claims.[15]  To state a claim for fraud or misrepresentation in connection with a securities offering, Plaintiffs must plead facts demonstrating that the loss was caused by the alleged fraudulent statements made during the offering, rather than from actions that occurred after the stock offering.  *See, e.g., Gorman v. Coogan*, No. 03-173-P-H, 2004 U.S. Dist. LEXIS 301, at *66-68 (D. Maine Jan. 13, 2004) (10b-5 claim dismissed where loss resulted from defendants' mismanagement and looting of company after offering, rather than from misrepresentations in offering documents); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61-62 (2d Cir. 1985) (same); *Rediker v. Geon Indus., Inc.*, 464 F. Supp. 73, 82 (S.D.N.Y. 1978) (no loss causation when loss caused by defendants' post-offering misdeeds).

Plaintiffs have failed to plead how the alleged false statements and omissions in the 2000 Series A offering caused WebAccess to fail in November 2002, nearly two years later.  The FAC does not allege that WebAccess failed due to specific facts that were misrepresented in the 2000 Series A offering and, to the contrary, makes clear

---

[15] *E.g., Chase v. Dow Chem. Co.*, 875 F.2d 278, 281 (10th Cir. 1989) (fraud must "cause[] damages"); *Conrad v. Imatani*, 724 P.2d 89, 94 (Colo. App. 1986) (causation is "essential element" of negligent misrepresentation claim); *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1479 (D. Colo. 1995) (COCCA requires "direct causal relationship" between misconduct and damages).

31103310.1

that WebAccess stayed in business *for nearly two full years after the offering (even though the offering was only expected to fund the company for six months or less)* and raised significant amounts of capital from other sources before finally shutting its doors.[16]   Indeed, Plaintiffs acknowledge that WebAccess's receipt of "$3 million in new capital" and $2.2 million more in other commitments" during the second quarter of 2002 "should have kept WebAccess in business for several more quarters, even assuming no additional revenues were generated."   FAC ¶ 54.   Having alleged that WebAccess should have had enough capital to survive in 2002, Plaintiffs can hardly blame the failure of WebAccess on misstatements made two years earlier.

While Plaintiffs assert in conclusory fashion that the WebAccess shares "could not have been offered on the market at any price," the factual allegations belie this assertion and demonstrate that WebAccess was a viable business for more than three years and continued to raise funds.[17]   Indeed, Judge Figa concluded based on the similar allegations in *Stephens* that "the gravamen of the complaint is that the directors mismanaged the business of WebAccess . . . not that the company was nonviable economically at the time the offerings were made so as to render the securities worthless," given that "the company existed from at least 1999 through November 2002, and it raised ample amounts of capital to fund operations."   Exh. B at 65:1-11.

Accordingly, as Judge Figa acknowledged in *Stephens*, the allegations do not demonstrate that the WebAccess shares were worthless from the beginning, or that the

---

[16] Grubka alleges that WebAccess ceased doing business on November 27 or November 28, 2002. *Compare* FAC ¶ 54 *with id.* ¶ 62.

[17] Only well pleaded factual allegations are taken as true on a motion to dismiss, while conclusory allegations are disregarded.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003).

company's ultimate failure in late 2002 was caused by the misrepresentations in the 2000 offering.  Because Plaintiffs have alleged no such facts, and because the failure of WebAccess in November 2002 is too attenuated from the alleged fraud in October 2000, Plaintiffs have not alleged loss causation.[18]

## V.    The Controlling Person Claims Should Be Dismissed For The Same Reasons They Were Dismissed in *Stephens*

As part of Counts 1 and 2, Plaintiffs have asserted controlling person claims against the individual officers and directors under Section 15 of the Securities Act and Section 20 of the Exchange Act.  As an initial matter, because the primary claims under Section 12(a)(1) and (2) of the Securities Act and Section 10(b) of the Exchange Act are time-barred, the controlling person claims must also fail.  *E.g.,* Exh. A at 19:16-19 ("As the claim under Section 12(a)(2) must be dismissed for statute of limitations reasons, so must the claim of control person liability predicated upon that section").

In addition, Judge Figa dismissed the Section 20(a) controlling person claim in *Stephens* because "[n]o sufficient indication has been set forth in the Complaint as to who controls whom for Section 20 liability or how that control is manifested.  This lack of factual specificity must result in dismissal of any claim, to the extent such a claim for controlling person liability has been purportedly asserted."   Exh. A at 19:21-20:2. Plaintiffs' Section 20 claims suffer from the same lack of specificity and must also be

---

[18] *See also Gorman v. Coogan*, No. 03-173-P-H, 2004 U.S. Dist. LEXIS 301, at *66-68 (D. Maine Jan. 13, 2004) (10b-5 claim dismissed where loss resulted from defendants' mismanagement and looting of company after offering, rather than from misrepresentations in offering documents); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61-62 (2d Cir. 1985) (same); *Rediker v. Geon Indus., Inc.*, 464 F. Supp. 73, 82 (S.D.N.Y. 1978) (no loss causation when loss caused by defendants' post-offering misdeeds).

dismissed on this ground.  *See id.*[19]  Additionally, to the extent Count 3 is not dismissed

on other grounds, Plaintiffs' control person claims under the Colorado Securities Act fail

for the same reasons as the federal control person claims asserted in Claims 1 and 2.

**VI.   Plaintiffs' Colorado Securities Act Claims (Count 3) Fail For The Same Reasons As The State Statutory Claims In *Stephens***

In his third cause of action, Plaintiffs assert claims under the Colorado Securities

Act for violations of CRS §§ 11-51-301 and 11-51-501, with civil liability attaching under

CRS § 11-51-604(3) and (4).  FAC ¶¶ 86-98.  The *Stephens* plaintiffs asserted the same

claims, and Judge Figa held that they were preempted by the National Securities

Market Improvement Act of 1996 ("NMSIA").  Exh. A at 24:16-25:14.  NSMIA states that

"no law, rule, regulation, or order, or other administrative action of any State or any

political subdivision thereof: (1) requiring, or with respect to, registration or qualification

of securities, or registration or qualification of securities transactions, shall directly or

indirectly apply to a security that (A) is a covered security; or (B) will be a covered

security upon completion of the transaction.  *Id.* § 77r(a).  Thus, NMSIA preempts all

state registration requirements for "covered securities."  *See, e.g., Temple v. Gorman*,

201 F. Supp. 2d 1238, 1243-44 (S.D. Fla. 2002).

As a matter of law, WebAccess stock qualifies as a "covered security" under

NMSIA.  Under 15 U.S.C. § 77r(b)(4)(D), a security is "covered" if sold pursuant to an

exemption from registration under SEC rules or regulations issued under 15 U.S.C. §

---

[19] *See also Adams v. Kinder-Morgan*, 340 F.3d 1083, 1108 (10th Cir. 2003) (collecting cases and dismissing control person claim where complaint merely alleged defendant was director of company); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 885 (S.D. Tex. 2004) (complaint "needs to allege some facts beyond a defendant's position or title to show that the defendant had actual power or control over the controlled person").

77d(2).[20]   The WebAccess securities offering was "made in reliance upon the non-public offering exemption from registration as provided in Section 4(2) of the Securities Act of 1933 (and Regulation D thereunder) . . . ."   1999 Memorandum at iv.   Accordingly, Plaintiffs' statutory claims for violation of the Colorado Securities Act are preempted.[21] Plaintiffs' Colorado statutory claims are also barred by the applicable statutes of limitation and/or repose, as stated above.

## VII.   Plaintiffs Have Not Sufficiently Alleged A COCCA Claim For Either Offering

Plaintiffs' claims under C.R.S. § 18-17-104(3) or (4) (which is patterned after 18 U.S.C. § 1962(c) and (d) of the federal RICO statute) fail for numerous reasons.   First, as stated above, the two-year statute of limitations C.R.S. § 13-80-102(i) has already run.[22]   The statute ran before the *Stephens* case was filed, and in any event, limitations was not tolled while *Stephens* was pending because the *Stephens* class action plaintiffs did not assert claims under C.R.S. § 18-17-104(3) or (4), and Plaintiffs themselves did

---

[20] *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1116 (N.D. Okla. 2003); *Temple*, 201 F. Supp. 2d at 243-44.

[21] "[R]egardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal 'covered securities' because they were sold pursuant to those rules."   *Id.*; 267 F. Supp. 2d at 1116.

[22] Since 1995, the PSLRA has barred federal RICO claims that are premised on securities fraud.   Before the PSLRA was enacted in 1995, securities fraud plaintiffs occasionally filed RICO claims to avoid the then-shorter statute of limitations for securities fraud claims.   Courts took a dim view of this practice and held that "strict construction of the RICO statute of limitations seeks to enhance the consistency of statute of limitations results."   *In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1117 n.11 (S.D.N.Y. 1993).   The court held that where plaintiffs had inquiry notice of possible fraud simply by reading the offering document and related letters, the RICO claim also failed.   *Id.* at 1123; *see also Harner v. Prudential-Bache Sec.*, No. 92-1353, 1994 U.S. App. LEXIS 25266, at *13-19 (6th Cir. Sept. 9, 2004) (plaintiff on inquiry notice of RICO allegations from reading prospectus); *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F. Supp. 2d 256, 268 (S.D.N.Y. 1997) (prospectus put investor on inquiry notice of RICO claim); *Wynne v. Equilease Corp.*, 94 Civ. 4992 (LMM), 1995 U.S. Dist. LEXIS 19173, at *12 (S.D.N.Y. Dec. 27, 1995) ("When the facts, transactions and events set out in the complaint as creating the cause of action are disclosed in the Offering Memorandum, as a matter of law, plaintiff reasonably discovers what he alleged as fraud at thee time of investment"; dismissing RICO claim).

not include these claims until their First Amended Complaint.[23]  Either way, the statute of limitations has run.

Second, the FAC does not plead specific facts that each Defendant "knowingly" participated in an enterprise through a pattern of racketeering activity, as required by C.R.S. § 18-17-104(3) or (4).  The alleged "predicate acts" that supposedly injured Plaintiffs are the alleged state and federal securities fraud claims in connection with the 2000 and 2002 offerings, which require individualized pleading of scienter.  While the FAC asserts in conclusory fashion that each Defendant knew that the representations in these offerings were false, the FAC does not plead facts demonstrating that the individual Defendants had actual knowledge of their falsity.

The COCCA claim therefore fails as to both offerings.  In addition, as stated above, Plaintiffs have not alleged loss causation in connection with the 2000 offering.

## VIII.  Plaintiffs' Negligent Misrepresentation Claim Fails Due To The "Third Party Transaction" Requirement

In Claim 5, Plaintiffs assert a claim for negligent misrepresentation.  As stated above, to the extent this claim is premised on the Series A 2000 offering, the claim is time-barred and fails for lack of causation.  In addition, the District of Colorado has held on numerous occasions that to state a negligent misrepresentation claim in Colorado, the alleged misrepresentations "must be supplied for use by the plaintiff in a transaction with a third party."[24]  If the complaint merely alleges that the negligent misrepresentation

---

[23] The *Stephens* plaintiffs and the Grubkas' Original Complaint instead asserted claims under C.R.S. § 18-17-104(1), which is a money laundering statute.  Plaintiffs' counsel apparently realized that the Colorado money laundering statute, like its federal analogue, does not give investors a cause of action to recover investments allegedly lost through fraud.

[24] *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1343 (D. Colo. 1997); *United Int'l Holdings, Inc. v. The Wharf (Holdings), Inc.*, 946 F. Supp. 861, 870 (D. Colo. 1996); *Snoey v. Advanced Forming*

injured the plaintiff "in connection with his relations with Defendants and not a third party," a party cannot state a negligent misrepresentation claim.  *Snoey v. Advanced Forming Tech., Inc.*, 844 F. Supp. 1394, 1400 (D. Colo. 1994).  Because Plaintiffs allege only injuries resulting from their transactions directly with Defendants, and not with any third parties, Plaintiffs' negligent misrepresentation claim fails as a matter of law.

Moreover, under Colorado common law, corporate directors are only liable to shareholders for gross or willful negligent misrepresentations, not mere negligent misrepresentations.[25]  Accordingly, Plaintiffs' negligent misrepresentation claims against the individual directors of WebAccess (Blair Whitaker, J. Roger Moody, James W. Stuckert, Archibald McGill, and L. Shawn Breskow) must be dismissed.

## IX.   Plaintiffs Lack Standing To Assert A Breach Of Fiduciary Duty Claim

In addition, Plaintiffs lack standing to assert a direct claim for breach of fiduciary duty or constructive fraud based on a fiduciary relationship (Claim 6).  As recognized by the Tenth Circuit and numerous other courts, this type of claim must be asserted derivatively, given that Plaintiffs do not allege that they suffered an injury that was separate and unique from the injury the WebAccess and the other shareholders

---

*Tech., Inc.*, 844 F. Supp. 1394, 1400 (D. Colo. 1994) (dismissing claim for negligent misrepresentation "because [plaintiff] alleges that negligent misrepresentation only in connection with his relations with Defendants and not a third party"); *see also Colorado Nat'l Bank of Denver v. Adventura Assoc.*, 757 F. Supp. 1167, 11-71-1173 (D. Colo. 1991); *Devries v. Taylor*, No. 92-B-409, 1993 U.S. Dist. LEXIS 21231, at * 12-13 (D. Colo. June 28, 1993).

[25] *See Stat-Tech*, 981 F. Supp. at 1332 ("[Defendant] will not be liable to [Plaintiff] or to any of the shareholder-claimants for conduct short of gross or willful negligence" because "the personal liability imposed on negligent suppliers of information under Restatement (Second) of Torts, § 552 . . . is different" from the liability imposed upon corporate directors.); *see also Resolution Trust Corp. v. Heiserman*, 839 F. Supp. 1457, 1463 (D. Colo. 1993) (in denying plaintiff's claim for negligent misrepresentation, the Court stated, "the directors of a business corporation other than a bank are not to be held responsible for mere errors of judgment or for want of prudence short of clear and gross negligence.").

suffered from Defendants' alleged mismanagement and/or receipt of improper profits from WebAccess.[26]  Accordingly, Plaintiffs lack standing to assert Claim 6.  Any attempt to assert a derivative claim would be barred by res judicata or collateral estoppel as a result of the *Stephens* settlement and dismissal.

**X.     Plaintiffs' Series E Claims Against Carol Carnie And Archibald McGill And Their Series A Claims Against Blair Whitaker Fail Because These Individuals Were Not At WebAccess During The Time In Question**

Finally, it should go without saying that Plaintiffs cannot assert claims against individuals who were not even at WebAccess during the offerings in question.   As Plaintiffs well know from the discovery and depositions they took in the *Stephens* case, Carol (Leveque) Carnie and Archibald McGill left WebAccess in February and August of 2001, respectively, while Blair Whitaker did not join the WebAccess Board until August 2001.   Accordingly, Carol Carnie and Archibald McGill cannot be liable for any of Plaintiffs' claims regarding the Series E 2002 offering, while Blair Whitaker cannot be liable for any of Plaintiffs' claims regarding the Series A 2000 offering.

---

[26] *E.g., Smith v. Waste Mgmt., Inc.*, 407 F.3d 381 (5th Cir. 2005) (claims must be asserted derivatively because "[t]he misrepresentations that allegedly caused Smith's losses injured not just Smith but the corporation as a whole"; reasoning that the shareholder's injury resulted from "a harm that befell all of Waste Management's stockholders equally"); *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (fiduciary duty claim must be asserted derivatively unless the stockholder can "demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation");[26] *Manzo v. Rite Aid*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *5 (Del. Ch. 2002), *aff'd*, 825 A.2d 239 (Del. 2003) (shareholder's fiduciary duty claim must be asserted derivatively because the alleged decline of the stock price that resulted from the company's alleged misrepresentations was "an injury suffered by all Rite Aid shareholders in proportion to their pro rata shares"); *In re Stat-Tech Int'l Corp.*, 47 F.3d 1054, 1060 (10th Cir. 1995) ("As a general rule, a stockholder cannot maintain a personal action against a director whose action causes harm to the corporation" unless he suffers an injury that is "unique to himself and not suffered by the other stockholders"); *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1332-33 (same); *Lewis v. Spencer*, 577 A.2d 753 (Del. 1990) ("When an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation"); *Nicholson v. Ash*, 800 P.2d 1352, 1357 (Col. App. 1990) (to assert direct claim, stockholder must allege injury "unique to himself and not suffered by the other stockholders").

There are no well-pled allegations regarding the dates on which these Defendants were affiliated with WebAccess.  Plaintiffs allege that Carol Carnie was only at WebAccess "at certain times relevant to this action," thus admitting that she was not at WebAccess for both offerings.  In violation of Rule 9(b) and the PSLRA, Plaintiffs do not specify the dates of her employment.  Plaintiffs also allege in conclusory fashion that Archibald McGill and Blair Whitaker were directors of WebAccess "at all times relevant to this action," but again fail to specify the dates of their tenure on the WebAccess Board.  Plaintiffs are well aware that these Defendants did not serve on the WebAccess Board for both offerings and are estopped under Fed. R. Civ. P. 11 from contending otherwise.  While Plaintiffs allege in conclusory fashion that "all Defendants" participated in both offerings, only well-pled allegations are taken as true on a motion to dismiss. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003).  Accordingly, the Series A claims against Blair Whitaker and the Series E claims against Carol Carnie and Archibald McGill must be dismissed.[27]

## CONCLUSION

For the foregoing reasons, Plaintiffs' First Amended Complaint should be dismissed in its entirety, with prejudice.

---

[27] The assertion of this argument on behalf of these three Defendants should not be construed as an admission regarding the respective dates of employment or affiliation with WebAccess of the other Defendants.

31103310.1

Respectfully submitted,

By:___s/Glenn W. Merrick_____
  Glenn W. Merrick
  G.W. MERRICK & ASSOCIATES, LLC
  Suite 912, 5445 DTC Parkway
  Greenwood Village, Colorado 80111
  Tel. (303) 831-9400
  Fax (303) 771-5803

ATTORNEY     FOR     WEBACCESS
INTERNATIONAL, INC.

By:___s/Peter A. Stokes_____
  John V. McDermott
  David Ball
  HOLME ROBERTS & OWEN LLP
  1700 Lincoln St., Suite 4100
  Denver, Colorado 80203-4541
  Tel.: (303) 866-0265

  Gerard G. Pecht
  FULBRIGHT & JAWORSKI L.L.P.
  1301 McKinney, Suite 5100
  Houston, TX 77010-3095
  Tel. (713) 651-5562
  Fax (713) 651-5246

  Peter A. Stokes
  FULBRIGHT & JAWORSKI L.L.P.
  600 Congress Ave., Suite 2400
  Austin, Texas 78701
  Tel. (512) 536-5287
  Fax (512) 536-4598

ATTORNEYS   FOR   DEFENDANTS   L.
SHAWN     BRESKOW,     ARCHIBALD
MCGILL, STEVE SPESARD; STEVEN
LYGA, BLAIR WHITAKER, CAROL L.
CARNIE, JAMES W. STUCKERT, AND
J. ROGER MOODY

31103310.1

By:    s/Peter J. Lucas
   Peter J. Lucas, Esquire
   APPEL & LUCAS, P.C.
   1917 Market Street, Suite A
   Denver, Colorado 80202

   ATTORNEY FOR DEFENDANT
   WILEY E. PRENTICE JR.

## CERTIFICATE OF SERVICE

I certify that this document was filed electronically on March 31, 2006. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Peter A. Stokes
Peter A. Stokes

31103310.1

30