IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  05-cv-02483-LTB-OES

JAMES M. AND LINDA J. GRUBKA, individually and on behalf of the
JAMES M. AND LINDA J. GRUBKA LIVING TRUST,

Plaintiffs,

v.

WEBACCESS INTERNATIONAL, INC., BLAIR WHITAKER, J. ROGER MOODY, L.
SHAWN BRESKOW, JAMES W. STUCKERT, ARCHIBALD J. MCGILL, WILEY E.
PRENTICE, JR., STEVEN A. SPESARD, STEVEN A. LYGA, CAROL L. LEVEQUE,
DANIEL W. BOYD, JAMES ROGERS, AND J.J.B. HILLIARD, W.L. LYONS, INC.,

Defendants.

---

## MEMORANDUM ORDER AND OPINION

---

Babcock, C.J.

During its three-year existence, defendant WebAccess International, Inc. ("WebAccess")

consumed several million dollars of capital before closing its doors on November 27, 2002.  The

plaintiffs, James and Linda Grubka, rueful of their lost $38,411 investment in WebAccess, here

assert theories of recovery premised upon allegations of securities fraud and malfeasance by

WebAccess' directors and officers, many of whom are named here as individual defendants.  The

claims against J.J.B. Hilliard, W.L. Lyons, Inc. ("Hilliard Lyons") are stayed pending arbitration.

WebAccess and defendants Blair Whitaker, J. Roger Moody, L. Shawn Breskow, James W.

Stuckert, Archibald J. McGill, Wiley E. Prentice, Jr., Steven A. Spesard, Steven A. Lyga, and

Carol L. (Leveque) Carnie  move for dismissal of the claims stated against them.  The motion is

adequately briefed and oral argument would not materially aid its resolution.  For the reasons

stated below, I GRANT the motion in part and DENY it in part.

The Grubkas' Amended Complaint incorporates by reference documents that the defendants published in furtherance of WebAccess' stock offerings. Those documents I consider without converting the motion into a motion for summary judgment. *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002), *cert. denied*, 539 U.S. 902, 123 S. Ct. 2246, 156 L. Ed. 2d 110 (2003). "Mere legal conclusions and factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir. 1997). "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *Id.*

Additionally, the defendants proffer a proxy statement filed with the United States Securities and Exchange Commission ("SEC") on behalf of Applied Computer Technology, Inc. ("ACTI"), a subsidiary of which WebAccess purchased in 1999. This document does not predicate any of the Grubkas' allegations and is not properly before me on this Rule 12(b) motion.

## I. Facts

From the Amended Complaint and the documents referenced in it, the following facts appear. WebAccess, a Delaware corporation with its principle place of business in Colorado, was incorporated in 1999 for the ostensible purpose of providing swift internet access to medium and small businesses located within large cities. Its incorporators intended to connect copper wires, which branch throughout office buildings, to cities' fiber-optic loops, called SONET rings, by means of a device called a digital subscriber line access multiplexer, or DSLAM. By this strategy, WebAccess hoped to give its customers an efficient alternative to the services of local exchange

2

telephone carriers.

Though the Amended Complaint is carefully constructed so as to frame putative allegations of securities fraud, stripped of their veneer the allegations fall into three categories. First, the Grubkas allege irregularities in instruments of debt that WebAccess offered in 1999. The Grubkas did not take part in that offering and I ignore these allegations.  Second, the Grubkas complain of deceptions – affirmative misrepresentations and material omissions – that the defendants allegedly perpetrated while offering securities, which the Grubkas purchased, in December, 2000 and October, 2002.  Third, the Grubkas allege that the defendants, particularly Mr. Prentice, who served as Chief Executive Officer of WebAccess, breached their duties to the company and mismanaged it into obsolescence and thus to insolvency.  These allegations also are cast as allegations of securities fraud – the defendants purportedly never intended to honor their duties to WebAccess investors – but I consider them according to their substance rather than their form.

**A.     Misrepresentations**

**1.     2000 offering**

In October of 2000, Hilliard Lyons, retained by WebAccess to solicit capital investments, wrote and disseminated to potential investors a private placement memorandum ("PPM") detailing the terms and conditions on which WebAccess would issue a minimum of 625,000 and a maximum of 1,500,000 shares of Series A preferred stock, each share costing eight dollars.  The PPM, exceeding 70 pages in length, also summarized WebAccess' business plan, identified risks and competitors, disclosed the company's financial condition (frail), stated the amounts of outstanding debt and equity, discussed the company's strategies and key personnel, and described

3

the company's previous activities and commitments.

The PPM demonstrated that WebAccess was not profitable in October, 2000.  First in a long list of "Risk Factors" was the revelation, "Since our formation, we have incurred increasing negative EBITDA (earnings before non-cash equity compensation, net interest expense, taxes, depreciation and amortization), substantial net losses and negative cash flow." PPM at 14.  The document explicitly contemplated that these trends would "continue for the foreseeable future." *Id*.  The warning continued,

> Moreover, we expect to continue to incur significant development and marketing costs as we expand into new markets.  As a result, we will need to generate significant revenue to achieve profitability, which may not occur.  If our revenue does not grow as needed to offset our increases in these costs, it is unlikely our business will succeed.

*Id*.  The PPM further admonished, "We are not aware of any company that has achieved positive EBITDA, operating income or cash flow by executing a business plan like ours."  *Id*.

The PPM revealed that WebAccess had an "accumulated deficit" of $1.5 million as of June 30, 2000.  PPM at 30.  It stated, "Our net tangible book value (deficit) at June 30, 2000 was $(752,365), or $(.31) per share of common stock." PPM at 28.  It warned that purchasers of Series A preferred stock would experience an immediate $2.77 dilution in the value of each share.

The cover page of the PPM stated, "This offering is being made on a best efforts basis only to selected 'accredited investors' as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933."  Below, in bold type, the document proclaimed,

> The preferred stock has not been registered under the Securities Act or any applicable state securities laws.  Neither the Securities and Exchange Commission nor any state regulatory authority has approved or disapproved these securities or the terms of the offering or determined if this memorandum is truthful or complete.  It is illegal for any person to tell you otherwise.

Other claims of exemption from registration requirements appear in the PPM.

Approached by a Hilliard Lyons representative, not a party in this case, the Grubkas read the PPM. They then paid $25,000 for Series A preferred stock.

The Grubkas complain chiefly that, as a result of circumstances not disclosed in the PPM, the Series A stock was worthless. They assert that, contrary to the inferences they drew from the PPM, WebAccess "was not a viable business." Amended Complaint ¶ 29(t). Central to their claim is that WebAccess in June, 1999 surreptitiously purchased ActNet, Inc., a subsidiary of ACTI, for an inflated price, benefitting Mr. Prentice and other WebAccess officials who owned interests in ACTI, to the disadvantage of WebAccess and its investors. The Grubkas charge that WebAccess used its capital to satisfy debts of ACTI, including tax liabilities for which Mr. Prentice and other ACTI officers were personally liable.

In fact, the PPM discussed the ActNet purchase, stating,

In June 1999, we acquired certain assets of ActNet, Inc., an [internet service provider ("ISP")] that has serviced Denver, Fort Collins, Colorado Springs and Boulder, Colorado since 1995. ActNet was a wholly owned subsidiary of Applied Computer Technology, Inc., or ACTI, a manufacturer and integrator of computer products since 1986. ACTI discontinued operations in November 1998 and declared itself insolvent. Wiley E. Prentice, Jr., our President and Chief Executive Officer is ActNet's President and sole director and ACTI's Chairman of the Board, President and Chief Executive Officer.
...
As part of the agreement and in consideration for the purchase of ActNet's assets, we paid to ACTI $600,000 in cash and 200,000 shares of our common stock. The 200,000 shares of stock were placed into a trust for the benefit of the creditors and stockholders of ACTI. Mr. Prentice serves as sole trustee of such trust and has sole discretion with regard to the voting and disposition of these shares.

PPM at 60. The PPM then listed debts that ActNet and ACTI had owed to Mr. Prentice's father and to Messrs. Moody and McGill. Next appearing in the PPM were recitals of various self-dealings among the defendants in their individual capacities and as representatives of WebAccess,

ActNet, and ACTI.

The PPM also contradicts others of the Grubkas' characterizations of it.  The Grubkas fault the PPM for its purported failure to disclose that WebAccess intended to repay loans to individual defendants.  However, the PPM identifies loans to Mr. Prentice's father, Mr. Moody, and Mr. McGill.  The Grubkas allege that the PPM failed to disclose "that defendants Prentice, Spesard, and Moody had managed [ACTI] and ActNet, Inc. into insolvency."  However, the PPM makes that disclosure.

The Grubkas assert that the PPM concealed WebAccess' true financial condition by overstating its profit margins and failing to disclose its debts, including liabilities to taxation authorities.  However, the PPM made no mystery that WebAccess was considerably in arrears, had negative cash flow, and had no expectation of proving profitable in the foreseeable future.

The Grubkas allege that the PPM failed to disclose that, in the event WebAccess did not sell the designated minimum of Series A shares, holders of convertible notes from a previous WebAccess offering would be entitled to repayment.  However, the PPM did disclose that Series A investors would be entitled to repayment of their investment in that event, and the Grubkas do not claim ever to have possessed any convertible notes.

### 2.    2002 offering

WebAccess continued to limp along.  On August 5, 2002, Mr. Prentice authored a letter to investors, including the Grubkas, soliciting the contribution of capital by the purchase of additional preferred stock, designated Series E.  This letter, which does not appear in the record, allegedly failed

to disclose that WebAccess was not a viable business and, indeed, that WebAccess was

> more than $1 million in arrears with its vendors and other creditors; was unable to pay many off its employees (sic) salaries and commissions, resulting in widespread resignations of key employees; had not paid payroll taxes when due; and was encumbered by a lien for failure to pay property taxes.

Amended Complaint ¶ 36©. The letter failed to amend WebAccess' 2001 annual report and 2002 quarterly reports, which had inaccurately represented that WebAccess was free from debt. It failed to disclose that WebAccess had not satisfied certain prerequisites to the Series E offering and that the offering was unauthorized. In reliance upon the letter, the Grubkas purchased 26,822 shares of Series E preferred stock for $13,411.

### B.    Mismanagement

The Grubkas allege that individual defendants, particularly Mr. Prentice, committed improper and unfaithful acts in the course of their management of WebAccess. They also assert that the defendants failed to fulfill promises made in support of the 2000 and 2002 stock offerings. These transgressions allegedly included: using deceptive transactions to create the impression that WebAccess had sold the requisite minimum shares of the Series A stock offering, when in fact the goal was not met; using proceeds from the 2000 stock offering for personal gain rather than pursuit of WebAccess' business objectives; failing to pay rent to owners of buildings in which WebAccess operated; failing to retain accountants and audit WebAccess' finances; failing to provide quarterly financial statements to stockholders; diverting corporate assets to other companies, which the defendants owned; merging with another corporation, called "Wired Business," which added no value to WebAccess; and defrauding creditors.

### C.     Class action lawsuit

Following WebAccess' November, 2002 collapse, several investors on July 11, 2003 filed suit in this Court, in a case captioned *Stephens et al v. WebAccess International, Inc. et al*, Civil Action No. 03-F-1521 ("Stephens Action").  The plaintiffs stated claims for various violations of securities laws and asserted a derivative claim against directors and officers.  On October 6, 2003, the plaintiffs amended the complaint to add a claim premised upon the 2002 Series E stock offering.

Among the issues that the parties presented to Judge Figa in the Stephens Action was whether to certify the plaintiffs as representatives of a class of investors for the purposes of Fed. R. Civ. P. 23.  On October 19, 2005, Judge Figa denied the plaintiffs' motion to certify a class, finding that the named plaintiffs did not adequately represent the purported class to satisfy the typicality and adequacy requirements of Rule 23.  Judge Figa noted "that the gravamen of the complaint is that the directors mismanaged the business of WebAccess causing its demise... but not that the company was nonviable economically at the time the offerings were made so as to render the securities worthless."  *Stephens Action*, Reporter's Transcript of October 19, 2005 Motions Hearing, at 65.  He therefore concluded that the plaintiffs had not alleged unmarketability – that the WebAccess securities had been patently worthless – for the purpose of benefitting from a presumption of reliance upon the defendants' alleged misrepresentations.

Judge Figa also denied the motion of Dane Kirkpatrick, who had purchased convertible notes from WebAccess in 2000, to intervene in the Stephens Action.  He determined that Mr. Kirkpatrick's motion to intervene had been untimely and that his intervention would, in any event, expand the scope of the claims.  The Grubkas, who also were seeking intervention in the Stephens

8

Action, had not then filed a motion to intervene and Judge Figa expressly declined to rule on the question whether they might properly be in the case.

## II.  Discussion

The Grubkas assert claims: under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 77a *et seq.*, and SEC Rule 10(b)(5), 17 C.F.R. § 240.10b-5, for failure to register and for fraud; under the Colorado Securities Act, Colo. Rev. Stat. § 11-51-301 *et seq.*, for failure to register; under Colorado law for negligent and intentional misrepresentation; under the Colorado Organized Crime Control Act, Colo. Rev. Stat. § 18-17-101 *et seq.* ("COCCA"), for conspiring to violate securities laws; and under Colorado law for breach of fiduciary duty and constructive fraud.  The defendants make a host of arguments in favor of dismissal.  I consider only those requisite to resolution of the motion.

Under Fed. R. Civ. P. 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  If the plaintiff has pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied.  *See id.*  In evaluating a 12(b)(6) motion to dismiss, "all well-pleaded factual allegations in the... complaint are accepted as true and viewed in the light most favorable to the nonmoving party."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

Fed. R. Civ. P. 9(b) provides, "In all averments of fraud... the circumstances constituting fraud... shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  More specifically, in order to plead fraud with

particularity, a complaint must "'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)).  The purpose of Rule 9(b) is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based... ." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992).

A.     **Securities Acts claims**

1.     **Limitations and repose**

The defendants argue that the Grubkas' claims under the 1933 and 1934 Acts are barred by the limitations and repose periods established in 15 U.S.C. § 77m and 28 U.S.C. § 1658(b). The one-year limitations period for fraud claims under Section 12(a)(2) of the 1933 Act runs from the date of "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" and for registration claims under Section 12(a)(1) runs from "the violation upon which it is based."  15 U.S.C. § 77m.  The three-year repose period accrued for the Grubkas' Section 12(a)(1) claim when "the security was bona fide offered to the public" and for their Section 12(a)(2) claim on the date of sale.  *Id.*  The Grubkas' fraud claim under Section 10(b) of the 1934 Act and Rule 10(b)(5) must have been brought "not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).

Inquiry notice triggers an investor's duty to exercise reasonable diligence.  *Sterlin v. Biomune Sys., Inc.*, 154 F.3d 1191, 1201 (10th Cir. 1998).  Thus, the "one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should

10

have discovered the facts underlying the alleged fraud." *Id*.  The Tenth Circuit has explained that "inquiry notice, which is triggered by evidence of the possibility of fraud, may exist before a reasonable investor is able to discover the facts underlying the alleged fraud." *Id*. at 1202 n.19. The standard is whether a reasonably diligent plaintiff would have discovered the fraud. *Id*. at 1202 n.20.

The claims premised upon the Series A purchase in 2000 are time-barred because the October, 2000 PPM itself put the Grubkas on inquiry notice of the defendants' alleged fraud.  As demonstrated above, the PPM in fact disclosed much of the information that the Grubkas allege was omitted.  And, though the document omitted some particulars concerning WebAccess' liabilities and the self-dealing of its officers, the data disclosed was more than sufficient to prompt a reasonable investor to inquire further.  The PPM revealed: that Messrs. Prentice, Spesard, and Moody had been affiliated with ACTI; that ACTI was insolvent at the time of the Series A offering; that WebAccess, under Mr. Prentice's leadership, had purchased ActNet, which Mr. Prentice oversaw, from ACTI, of which Mr. Prentice was President, CEO, and Chairman; that Mr. Prentice exercised exclusive control over the proceeds of the ActNet purchase and sale; that WebAccess had assumed debts of ActNet to Mr. Prentice's father and Mr. Moody, and that WebAccess had borrowed money from Mr. McGill; that WebAccess was considerably in arrears; that WebAccess had lost money since its inception, had no foreseeable expectation of positive cash flow, and was following a business model that never had succeeded.

These facts, and others that appear in the PPM, would excite the inquiry of a reasonable investor.  Though the PPM failed to detail the precise terms of the ActNet purchase and WebAccess' liabilities, it painted the portrait of a corporation in a precarious financial position

whose officers were employing corporate assets for dubious ends.  Thus, though the PPM did not

"discuss each and every aspect" of the conduct of which the Grubkas now complain, it was

sufficiently candid to "alert a reasonable investor to the possibility of fraud."  *Sterlin*, 154 F.3d at

1204.  "The purpose behind commencing the one-year limitations period upon inquiry notice is to

discourage investors from adopting a wait-and-see approach," *Sterlin*, 154 F.3d at 1202, which is

what the Grubkas did here.  Every fact that the Grubkas now claim adversely affected the value of

the Series A stock on December 1, 2000 was either mentioned or discussed in the PPM, which the

Grubkas read on or before December 1, 2000.

On the other hand, the fraud claims are not time-barred to the extent that they are

predicated upon the 2002 Series E offering.  Taking the allegations of the Amended Complaint as

true, it appears that the 2001 annual report, the 2002 quarterly report, Mr. Prentice's August 5,

2002 letter, and other communications that the defendants made in furtherance of the August,

2002 Series E offering affirmatively misrepresented WebAccess' financial condition.  The

Grubkas received inquiry notice of those falsities on November 28, 2002, when WebAccess

declared itself insolvent; the defendants offer nothing to suggest an earlier accrual date.  The

October 6, 2003 amendment of the complaint in the Stephens Action to include claims premised

upon the Series E offering tolled the limitations and repose periods for the Series E claims until

Judge Figa on October 19, 2005 denied the motions of the plaintiffs in that case to certify a class.

The Series E fraud claims under Rule 10(b)(5) and Section 12(a)(2) of the 1993 Act are thus

timely.  *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S. Ct. 756, 38 L. Ed. 2d

713 (1974); *Joseph v. Wiles*, 223 F.3d 1155, 1168 (10th Cir. 2000).

The defendants argue that the Grubkas are not entitled to *American Pipe* tolling because

their claims were not among those asserted in the Stephens Action.  They conflate the Grubkas'

claims with those of Dane Kirkpatrick, whom Judge Figa did not permit to intervene in the

Stephens Action.  They assert, "Judge Figa has already expressly held that the 2000 claims were

not part of the Stephens class action."  Moving Defendant's Reply in Support of Motion to

Dismiss Plaintiffs' First Amended Complaint, 2.  In fact, however, Mr. Kirkpatrick's claims were

predicated upon a March, 2000 convertible note offering, not the Series A and Series E stock

offerings of which the Grubkas complain.  Indeed, Judge Figa expressly declined to rule on the

question whether the Grubkas could permissibly intervene in the Stephens Action.  The

defendants' potential liability should not be extinguished simply because Judge Figa left that issue

unresolved.   *Joseph*, 223 F.3d at 1168.

The Stephens Action began after all of the Grubkas' Series A claims had expired on

December 1, 2002.  Tolling does not salvage those claims and they are dismissed.  Also, the

Grubkas' Section 12(b)(1) claim for failure to register the Series E stock is barred because it

accrued in August, 2002, more than a year before it was asserted in the Stephens Action by

amendment of the complaint.

### 2.     Scientor

Claims under Section 10(b) of the 1934 Act are fraud claims and therefore must comport

with the particularization requirements of Rule 9(b).  In addition, the Private Securities Litigation

Reform Act of 1995 ("PSLRA") imposes upon Section 10(b) claimants various pleading

requirements, including that "the complaint shall, with respect to each act or omission alleged to

violate this chapter, state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 77u-4(b)(2).

The defendants argue that the PSLRA requires the Grubkas to state particular facts demonstrating that each one of them individually acted with the required state of mind. They fault the Grubkas for failing to distinguish between them. However, under the group publication doctrine, directors and officers are presumed to act with scientor when the corporation publishes a document for the contents of which they bear responsibility. "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1254 (10th Cir. 1997).

Because the pleading standards of Rule 9(b) and the PSLRA are functionally the same, if not perfectly contiguous, allegations of fraudulent group publications satisfy both sets of requirements. *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1225 & n.5 (D. Colo. 1998); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156, 1166 (D. Colo. 2000); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1086 n.2 & 1087-1088 (D. Colo. 2004); *In re Qwest Communs. Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005). Thus, the Grubkas' allegations that WebAccess' annual and quarterly reports in 2001 and 2002 contained fraudulent assertions are sufficient to state a claim under Section 10(b).

### 3.   Causation

The defendants argue that the Grubkas have failed to plead loss causation, an element of the Rule 10b-5 claim. Specifically, taking the allegations of the Amended Complaint as true, they contend that WebAccess stock was not worthless from the beginning but rather became so through mismanagement; they read the allegations to suggest that any loss occurred as a result of

malfeasance following the stock offerings, not as a result of any latent financial deficiency fraudulently concealed.

As to the 10b-5 claim premised upon the Series A offering, already dismissed, the defendants' argument has merit. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985). However, the Grubkas are alleged to have participated in the Series E offering only after the defendants misrepresented the corporation's financial health. Indeed, that WebAccess closed its doors less than two months after the Grubkas purchased the Series E stock in reliance upon the defendants' rosy declamations suggests that the company's fatal ailment inhered undisclosed within its balance sheets at the time of the Series E offering.

### 4.      Controlling person liability

The Grubkas allege that any defendants who did not actively participate in the fraud are liable nonetheless under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t, as controlling persons. As the defendants correctly point out, an allegation that a person was a member of WebAccess' board of directors is insufficient, without a specific allegation demonstrating control or influence over the wrongdoing or over the day-to-day business of the company, to bring that person under the statute. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003). Of course, for the reasons stated above, the non-officer directors – Whitaker, Moody, and McGill – may be liable if the Grubkas can demonstrate their participation, with scientor, in the allegedly fraudulent misrepresentations. *Anixter v. Home-Stake Prod. Co.*, 77 F. 3d 1215, 1225 (10th Cir. 1996).

### B.   Colorado Securities Act claim

#### 1.   Preemption

The defendants argue that the National Securities Market Improvement Act of 1996

("NSMIA") preempts shareholders' claims under Colo. Rev. Stat. § 11-51-301 for WebAccess'

alleged failure to register its securities.  The NSMIA expressly preempts state laws that concern

the registration or qualification of "covered securities."  15 U.S.C. § 77r(a).  Among the covered

securities contemplated in the NSMIA are those described in 15 U.S.C. § 77r(b)(4)(D), which

provides, "A security is a covered security with respect to a transaction that is exempt from

registration under this subchapter pursuant to... Commission rules or regulations issued under

section 77d(2) of this title... ."  WebAccess purported in the PPM to offer the Series A shares

pursuant to the exemption stated in Rule 506 of the SEC's Regulation D, 17 C.F.R. § 230.506,

and claims thus to come under the preemption provision of 15 U.S.C. § 77r(b)(4)(D).

The Grubkas point out that whether WebAccess' securities were exempt from registration

is one of the contested issues in this case.  They cite *Buist v. Time Domain Corp.*, 926 So. 2d

290, 296 (Ala. 2005) for the proposition that "exemption and preemption are functionally

equivalent" and the defendants must therefore prove preemption of the state law claim by proving

exemption under the NSMIA.

The authorities are divided on this question.  In *Temple v. Gorman*, 201 F. Supp. 2d 1238

(S.D. Fla. 2002) the court reviewed the legislative history of the NSMIA and determined that

Congress intended to preempt state law whenever securities are "offered or sold pursuant to a

Commission rule or regulation adopted under such section 4(2)."  *Id*. at 1243.  The court went

on,

16

> Here, Plaintiffs have alleged that Defendants' private placement of securities "purported to be exempt from registration pursuant to Rule 506 of Regulation D promulgated by the SEC." Construing this allegation in Plaintiffs' favor, the Court finds that the securities in this case were "offered or sold pursuant to a Commission rule or regulation adopted under section 4(2)." Regardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal "covered securities" because they were sold pursuant to those rules.

*Id.* at 1243-1244 (citation omitted).

Other courts have followed the *Temple* court's holding without explanation. *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1116 (N.D. Okla. 2003); *Pinnacle Communs. Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F. Supp. 2d 1073 (D. Minn. 2006).

On the other side are the *Buist* decision and *Hamby v. Clearwater Consulting Concepts, LLLP*, – F. Supp. 2d –, 2006 WL 1126842 (E.D. Ark. 2006), in which those courts held that a defendant must prove preemption by proving exemption. The *Hamby* court noted that Congress has not completely preempted the field of securities regulation and that the scope of preemption by the NSMIA – laws governing "covered securities" – is limited. "Thus," the court concluded, "the only way to assert federal preemption is to first show that an exemption from federal registration actually applies." *Hamby*, 2006 WL 1126842 at *5. I agree with the *Hamby* court's reasoning.

The *Temple* court read language into the statute that does not appear there. A security is covered if it "is exempt from registration... ." 15 U.S.C. § 77r(b)(4). Nowhere does the statute indicate that a security may satisfy the definition if it is *sold pursuant to* a putative exemption. If Congress had intended that an offeror's representation of exemption should suffice it could have said so, but did not. Such an intent seems unlikely, in any event; that a defendant could avoid liability under state law simply by declaiming its alleged compliance with Regulation D is an

unsavory proposition and would eviscerate the statute.

Nor is it necessary to look to the legislative history; the statute is unambiguous. *Anderson v. United States Dep't of Labor*, 422 F.3d 1155, 1177 (10th Cir. 2005).

### 2.      Statute of repose

The defendants argue that the blue sky claim is barred by the two-year repose provision of Colo. Rev. Stat. § 11-51-604(8), which runs from the date of the contract of sale.  The defendants correctly point out that, to the extent the claim rests upon the Series A transaction, which consummated on December 1, 2000, the period of repose expired before the Stephens Action commenced.  However, the defendants do not argue that the Stephens Action was ineffectual to toll any state-law claim premised upon the Series E transaction.

I note that Colorado courts follow the *American Pipe* rule.  *Kuhn v. Dep't of Revenue*, 897 P.2d 792, 795 (Colo. 1995).  As the Colorado Court of Appeals explained in *First Interstate Bank, N.A. v. Central Bank & Trust Co.*, 937 P.2d 855, 863 (Colo. Ct. App. 1996), common policies underlie the repose provisions of both federal securities laws and the Colorado Securities Act.  The Grubkas' Series E claim is thus timely for the purposes of the Colorado Securities Act.

### C.      Negligent misrepresentation claim

The defendants point out, and the Grubkas do not dispute, that they may be held liable for negligent misrepresentation only if they supplied the offending information for use in a transaction not involving them.  Restatement (Second) of Torts § 552 (1977); *Colorado Nat'l Bank v. Adventura Assoc., L.P.*, 757 F. Supp. 1167, 1172 (D. Colo. 1991); *Snoey v. Advanced Forming Technology*, 844 F. Supp. 1394, 1400 (D. Colo. 1994); *Van Heerden v. Total Petroleum*, 942 F. Supp. 468, 474-475 (D. Colo. 1996).  The Amended Complaint omits that essential element.  The

fourth claim is dismissed to the extent that it states a claim for negligent misrepresentation.

      **D.**    **COCCA claim**

The Grubkas' COCCA claim fails for untimeliness.  The two-year statute of limitations for a COCCA claim arising out of the Series A offering expired on December 1, 2002.  Colo. Rev. Stat. § 13-80-102(1)(I); *FDIC v. Refco Group*, 989 F. Supp. 1052, 1078 (D. Colo. 1997).  Also, the plaintiffs in the Stephens Action did not assert a COCCA claim.  Thus, any COCCA claim arising out of the Series E transaction expired, at the latest, on November 28, 2004, nearly a year before the Grubkas initiated this lawsuit.

      **E.**    **Fiduciary duty claim**

The Grubkas press their sixth claim for breach of fiduciary duty and constructive fraud, but have brought no claims derivatively on the corporation's behalf.  I find nothing in the Amended Complaint from which I might conclude that the Grubkas have standing to challenge the perfidy of which they accuse the defendants; they allege no unique injury that other stockholders did not share and no deprivation of a right distinct from the rights of the corporation.  *River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398, 403-404 (Colo. Ct. App. 1991); *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988); *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1200 (10th Cir. 2004).  The sixth claim is dismissed.

19

**F.      Miscellany**

The defendants assert that Ms. (Leveque) Carnie and Mr. McGill left WebAccess in February and August, 2001, respectively.  If discovery reveals that those defendants were not involved in formulating the alleged misrepresentations on which the Grubkas relied in purchasing the Series E stock, then they will surely be dismissed from the case.  However, that is a factual dispute for the parties to litigate and I cannot resolve it at this stage.

Accordingly, it is ORDERED that:

1) the motion to dismiss is GRANTED in part and DENIED in part;

2) the first, second, and third claims are dismissed to the extent that they are predicated upon the October, 2000 Series A stock offering and to the extent that they are predicated upon alleged violations of Section 12(a)(1) of the 1933 Act, 15 U.S.C. § 77l(1);

3) the first, second, and third claims are not dismissed to the extent that they are predicated upon violations of Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(2); Rule 10(b)(5) under the 1934 Act, 17 C.F.R. § 240.10b-5; and Colo. Rev. Stat. § 11-51-301 made in connection with the August, 2002 Series E stock offering;

4) the second claim is dismissed against the individual defendants to the extent that it is predicated upon controlling person liability under Section 20(a) of the 1934 Act but not dismissed to the extent that any of the individual defendants can be established to have intentionally participated in the alleged fraud;

5) the fourth claim is dismissed to the extent that the alleged misrepresentations were negligently made but not to the extent that they were intentionally made;

6) the fifth claim is dismissed; and

7) the sixth claim is dismissed.

Dated: June __28__, 2006, in Denver, Colorado.

BY THE COURT:

__s/Lewis T. Babcock_____
Lewis T. Babcock, Chief Judge

21